No. 22-9578

---

# In the United States Court of Appeals for the Tenth Circuit

---

MAGNETSAFETY.ORG;
HOBBY MANUFACTURERS ASSOCIATION;
NATIONAL RETAIL HOBBY STORES ASSOCIATION, INC.,

*Petitioners*,

v.

CONSUMER PRODUCT SAFETY COMMISSION,

*Respondent.*

---

*On Petition for Review of Final Action of the*
*United States Consumer Product Safety Commission*

---

## BRIEF OF CONSTITUTIONAL ACCOUNTABILITY CENTER
## AS *AMICUS CURIAE* IN SUPPORT OF RESPONDENT

---

Elizabeth B. Wydra
Brianne J. Gorod
Brian R. Frazelle
CONSTITUTIONAL
   ACCOUNTABILITY CENTER
1200 18th Street NW, Suite 501
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *amicus curiae* states that no party to this brief is a publicly held corporation, issues stock, or has a parent corporation.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................... iii

GLOSSARY ................................................................................................ vii

INTEREST OF *AMICUS CURIAE* ................................................................ 1

INTRODUCTION ......................................................................................... 1

ARGUMENT ................................................................................................ 6

    I.    *Seila Law* Did Not Call into Question the Legitimacy of
        Multimember Independent Agencies ............................................ 6

        A.    *Seila Law* Addressed Only the Innovation of an Independent
            Agency Led by a Single Director .............................................. 6

        B.    *Seila Law* Rested on Three Features Unique to Single-Director
            Independent Agencies ............................................................... 9

    II.    Established Practice Places the Validity of Multimember
        Independent Agencies Beyond Doubt .......................................... 15

    III.    Constitutional Text and History Further Underscore the Legitimacy
        of Multimember Independent Agencies ....................................... 23

CONCLUSION ............................................................................................ 29

# TABLE OF AUTHORITIES

**Page(s)**

<u>Cases</u>

*Bowsher v. Synar,*
    478 U.S. 714 (1986)................................................................ 24

*City of Arlington v. FCC,*
    569 U.S. 290 (2013)........................................................ 5, 20, 22

*Collins v. Yellen,*
    141 S. Ct. 1761 (2021)...................................................... 3, 5, 8

*Free Enter. Fund v. PCAOB,*
    561 U.S. 477 (2010)............................................................ *passim*

*Humphrey's Ex'r v. United States,*
    295 U.S. 602 (1935)................................................ 3, 14, 21, 28

*In re Hennen,*
    38 U.S. 230 (1839)............................................ 5, 23, 25-27

*McAllister v. United States,*
    141 U.S. 174 (1891)................................................................ 28

*McCulloch v. Maryland,*
    17 U.S. 316 (1819)................................................................ 18

*McPherson v. Blacker,*
    146 U.S. 1 (1892)................................................................ 17

*Mistretta v. United States,*
    488 U.S. 361 (1989)................................................................ 16

*Morrison v. Olson,*
    487 U.S. 654 (1988)........................................................ 20, 21

*Myers v. United States,*
    272 U.S. 52 (1926)........................................................ 24, 25, 28

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
    567 U.S. 519 (2012)................................................................ 10

*NLRB v. Noel Canning,*
    573 U.S. 513 (2014)........................................................ 4, 17, 24

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

*Parsons v. United States*,
 167 U.S. 324 (1897)................................................................ 28

*Plaut v. Spendthrift Farm, Inc.*,
 514 U.S. 211 (1995)................................................................ 10

*The Pocket Veto Case*,
 279 U.S. 655 (1929)................................................................ 16

*Seila Law LLC v. CFPB*,
 140 S. Ct. 2183 (2020)............................................................ *passim*

*Shurtleff v. United States*,
 189 U.S. 311 (1903)................................................................ 28

*Stuart v. Laird*,
 5 U.S. 299 (1803).................................................................... 18, 22

*United States v. Curtiss-Wright Exp. Corp.*,
 299 U.S. 304 (1936)................................................................ 20

*United States v. Midwest Oil Co.*,
 236 U.S. 459 (1915)................................................................ 17

*Virginia Off. for Prot. & Advoc. v. Stewart*,
 563 U.S. 247 (2011)................................................................ 10

*Wiener v. United States*,
 357 U.S. 349 (1958)................................................................ 21

*Youngstown Sheet & Tube Co. v. Sawyer*,
 343 U.S. 579 ......................................................................... 16

*Zivotofsky v. Kerry*,
 576 U.S. 1 (2015).................................................................... 4, 16

<u>Constitutional Provisions, Statutes, and Legislative Materials</u>

Act of July 27, 1789, ch. 4, 1 Stat. 28....................................... 26

Act of May 15, 1820, ch. 102, 3 Stat. 582................................. 28

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

Act of Mar. 2, 1889, ch. 382, 25 Stat. 855 .................................................. 19

Act of June 29, 1906, ch. 3591, 34 Stat. 584 .............................................. 19

An Act to Create a Federal Trade Commission, ch. 311, 38 Stat. 717
  (1914) ...................................................................................................... 20, 21

An Act to Regulate Commerce, ch. 104, 24 Stat. 379 (1887) ............... 1, 11, 18, 19

1 Annals of Cong. (1789) ........................................................................... 26

15 U.S.C. § 2053(a) .................................................................................. 11, 12

15 U.S.C. § 2053(b) .................................................................................. 11, 12

15 U.S.C. § 2053(c) .................................................................................. 11, 13

15 U.S.C. § 2053(f) ................................................................................... 13

15 U.S.C. § 2053(g) .................................................................................. 13

U.S. Const. art. I, § 8, cl. 18 ..................................................................... 23, 24

U.S. Const. art. II, § 1, cl. 1 ...................................................................... 5, 23

U.S. Const. art. II, § 2 ............................................................................... 23, 24

U.S. Const. art. II, § 3 ............................................................................... 23

<u>Books, Articles, and Other Authorities</u>

Daniel D. Birk, *Interrogating the Historical Basis for A Unitary
  Executive*, 73 Stan. L. Rev. 175 (2021) .................................................. 25

Marshall J. Breger & Gary J. Edles, *Established by Practice: The
  Theory and Operation of Independent Federal Agencies*, 52 Admin.
  L. Rev. 1111 (2000) ................................................................................ 19, 22

Edward S. Corwin, *Tenure of Office and the Removal Power under
  the Constitution*, 27 Colum. L. Rev. 353 (1927) ................................... 28

# TABLE OF AUTHORITIES – cont'd

**Page(s)**

David P. Currie, *The Constitution in Congress: The First Congress and the Structure of Government, 1789–1791*, 2 U. Chi. L. Sch. Roundtable 161 (1995) ........................................................... 26

Robert E. Cushman, *The Independent Regulatory Commissions* (1941) ... 18

Martin S. Flaherty, *The Most Dangerous Branch*, 105 Yale L.J. 1725 (1996).................................................................................. 25

Neal Kumar Katyal & Thomas P. Schmidt, *Active Avoidance: The Modern Supreme Court and Legal Change*, 128 Harv. L. Rev. 2109 (2015)...................................................................................... 10

James Kent, *Commentaries on American Law* (1826) ............................. 27

Leah M. Litman, *Debunking Antinovelty*, 66 Duke L.J. 1407 (2017) ........ 10

Letter from James Madison to Edmund Pendleton (June 21, 1789)........... 26

Letter from James Madison to Spencer Roane (Sept. 2, 1819) ................. 17, 24

Saikrishna Prakash, *New Light on the Decision of 1789*, 91 Cornell L. Rev. 1021 (2006) ................................................................... 26, 27

*Records of the Federal Convention of 1787* (Max Farrand ed., 1911)....... 24

Joseph Story, *Commentaries on the Constitution of the United States* (1833)..................................................................................... 25, 27

*The Federalist No. 39* (Clinton Rossiter ed., 1961).................................... 26

White House Historical Association, *When was electricity first installed at the White House?*, https://www.whitehousehistory.org/questions/in-what-year-was-electricity-installed-in-the-white-house ......................... 1

# GLOSSARY

| | |
|---|---|
| CFPB | Consumer Financial Protection Bureau |
| CPSC | Consumer Product Safety Commission |
| FHFA | Federal Housing Finance Agency |
| FTC | Federal Trade Commission |
| ICC | Interstate Commerce Commission |
| SEC | Securities and Exchange Commission |

## INTEREST OF *AMICUS CURIAE*[1]

Constitutional Accountability Center is a think tank and public interest law firm dedicated to fulfilling the progressive promise of the Constitution's text and history.  CAC works in our courts to improve understanding of the Constitution and accordingly has an interest in this case.

## INTRODUCTION

Congress has been creating multimember independent agencies for most of the nation's history—they have been part of the executive branch for longer than the light bulb.[2]  Nearly a century of Supreme Court precedent has affirmed the constitutional legitimacy of these agencies.  And relying on that unbroken line of cases, Congress has established dozens of regulatory boards and commissions wielding substantial executive power whose leaders are removable only for cause.

In *Seila Law LLC v. CFPB*, 140 S. Ct. 2183 (2020), the Supreme Court addressed "a new situation, never before confronted by the Court," involving the

---

[1] No counsel for a party authored this brief in whole or in part, and no person other than *amicus* or its counsel made a monetary contribution to it preparation or submission.  All parties have consented to the filing of this brief.

[2] *Compare* An Act to Regulate Commerce, ch. 104, § 11, 24 Stat. 379, 383 (1887) (establishing Interstate Commerce Commission), *with* White House Historical Association, *When was electricity first installed at the White House?*, https://www.whitehousehistory.org/questions/in-what-year-was-electricity-installed-in-the-white-house (electricity installed at White House and at State, War, and Navy Building in 1891).

"almost wholly unprecedented" creation of an independent agency led "by a single individual." *Id.* at 2211, 2201, 2197.  Making clear that it was not "revisit[ing] our prior decisions," the Court found "compelling reasons not to extend those precedents to the novel context of an independent agency led by a single Director." *Id.* at 2192.

*Seila Law*'s holding rested on three features of single-director independent agencies that the Court concluded distinguish them from "a traditional independent agency, run by a multimember board." *Id.*  First, the Court explained, such agencies are "an innovation with no foothold in history or tradition." *Id.* at 2202. The Court's approval of removal protections for multimember boards was not "a freestanding invitation for Congress to impose additional restrictions on the President's removal authority" or to make other "innovative intrusions on Article II." *Id.* at 2206, 2205.  Second, the Court concluded that a single-director leadership structure is a greater "impediment to the President's oversight of the Executive Branch," because it "forecloses certain indirect methods of Presidential control" and deprives some presidents of "any opportunity to shape [the agency's] leadership." *Id.* at 2198, 2204.  Third, unlike "a multimember board with a diverse set of viewpoints and experiences," the Court concluded that empowering a single director with "no colleagues to persuade" impermissibly "clashes with

constitutional structure by concentrating power in a unilateral actor." *Id.* at 2192, 2204 (quotation marks omitted).

The Court has since reiterated that it "did not revisit [its] prior decisions" in *Seila Law* but merely declined "to extend those precedents to the novel context of an independent agency led by a single Director." *Collins v. Yellen*, 141 S. Ct. 1761, 1783 (2021) (quotation marks omitted).  Nevertheless, Petitioners contend that the opinion revolutionized the long-settled understanding of *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), which upheld the constitutionality of "expert agencies led by a *group* of principal officers removable by the President only for good cause." *Seila Law*, 140 S. Ct. at 2192 (emphasis in original). According to Petitioners, "principal officers who exercise substantial executive power" must *all* be removable at will, Pet. Br. 15, even if they help lead expert agencies "as members of a board or commission," *Seila Law*, 140 S. Ct. at 2201.

*Seila Law* belies that interpretation, repeatedly emphasizing that it reaches only the "new configuration" of "an independent agency that wields significant executive power *and is run by a single individual*." *Id.* at 2192 (emphasis added); *see, e.g.*, *id.* at 2211 ("principal officers who, *acting alone*, wield significant executive power" (emphasis added)).  And even if *Seila Law* were not so definitive on this point, Petitioners' claim would still be foreclosed by established practice,

which has long settled the constitutional legitimacy of multimember independent agencies.

In separation-of-powers cases, the judiciary places "significant weight upon historical practice," *Zivotofsky v. Kerry*, 576 U.S. 1, 23 (2015) (quotation marks omitted), because it embodies "the compromises and working arrangements that the elected branches of Government themselves have reached," *NLRB v. Noel Canning*, 573 U.S. 513, 526 (2014). That is so "even when the nature or longevity of that practice is subject to dispute, and even when that practice began after the founding era." *Id.* at 525.

As noted above, Congress has been assigning regulatory authority to multimember independent agencies since the nineteenth century. These agencies have wielded substantial executive power for generations. And during that time, the Supreme Court has consistently affirmed their constitutionality, right up to its recognition in *Seila Law* that Congress could amend the constitutional defects of the Consumer Financial Protection Bureau by "converting the CFPB into a multimember agency." 140 S. Ct. at 2211. Thus, even if the legitimacy of multimember independent agencies were suddenly up for debate, as Petitioners claim, the long-established practice of the elected branches resolves that debate.

The Consumer Product Safety Commission cannot be distinguished from the host of other multimember regulatory agencies across the federal government. All

4

of these agencies wield the Constitution's "executive Power." *City of Arlington v. FCC*, 569 U.S. 290, 304 n.4 (2013) (quoting U.S. Const. art. II, § 1, cl. 1). And there is no "clear standard," *Collins*, 141 S. Ct. at 1784, by which to pick and choose which of them wields "substantial" or "immense" power, Pet. Br. 15. As the Supreme Court recently underscored, the validity of removal restrictions does not hinge on a subjective inquiry into "the relative importance of the regulatory and enforcement authority of disparate agencies." *Collins*, 141 S. Ct. at 1785.

Multimember independent agencies like the CPSC are also fully consonant with the Constitution's original meaning. The constitutional text, which "is silent with respect to the power of removal," *In re Hennen*, 38 U.S. 230, 258 (1839), does not specify the exact boundary between the president's executive power and Congress's authority to shape the federal government. The early consensus that presidents have inherent removal authority was coupled with a recognition that legislation can limit this authority to some extent, an option Congress began exercising in the nineteenth century. And as the Supreme Court has consistently acknowledged, conditioning removal on good cause is a permissible limit in the context of multimember expert bodies.

In *Seila Law*, as in *Free Enterprise Fund v. PCAOB*, 561 U.S. 477 (2010), the Supreme Court simply drew a line in the sand—reaffirming "the importance of removal as a tool of supervision," *id.* at 499, and prohibiting "additional

restrictions on the President's removal authority" that have "no foothold in history

or tradition," *Seila Law*, 140 S. Ct. at 2206, 2202.  It did not license lower courts to

strike down a longstanding agency structure that the Supreme Court has repeatedly

upheld—that of "a traditional independent agency headed by a multimember board

or commission."  *Id.* at 2193.

**ARGUMENT**

**I.    *Seila Law* Did Not Call into Question the Legitimacy of Multimember Independent Agencies.**

**A.    *Seila Law* Addressed Only the Innovation of an Independent Agency Led by a Single Director.**

The Supreme Court could hardly have been clearer in *Seila Law*: "We hold

that the CFPB's leadership *by a single individual* removable only for inefficiency,

neglect, or malfeasance violates the separation of powers."  140 S. Ct. at 2197

(emphasis added).  "Instead of placing the agency under the leadership of a board

with multiple members," Congress "deviated from the structure of nearly every

other independent administrative agency in our history" and "provided that the

CFPB would be led by a single Director."  *Id.* at 2191.  "The question before us,"

the Court said, "is whether *this arrangement* violates the Constitution's separation

of powers."  *Id.* (emphasis added).

According to the Court, the president's Article II authority "generally

includes the ability to remove executive officials," but there are "exceptions" to

6

this rule.  *Id.* at 2197, 2192.  One exception was first recognized in *Humphrey's Executor*, which "held that Congress could create expert agencies led by a *group* of principal officers removable by the President only for good cause."  *Seila Law*, 140 S. Ct. at 2192 (emphasis in original).

In *Seila Law*, the Court was "asked to extend these precedents to a new configuration: an independent agency that wields significant executive power *and is run by a single individual*."  *Id.* (emphasis added).  The Court declined that invitation because it concluded that there were "compelling reasons not to extend those precedents to the novel context of an independent agency led by a single Director."  *Id.*  That arrangement, it said, "lacks a foundation in historical practice and clashes with constitutional structure by concentrating power in a unilateral actor insulated from Presidential control."  *Id.*

In refusing to broaden its precedent, the Court was clear that "we need not and do not revisit our prior decisions allowing certain limitations on the President's removal power."  *Id.*  Rather, just as in *Free Enterprise Fund*, the question instead was "whether to extend those precedents to the 'new situation' before us," *Seila Law*, 140 S. Ct. at 2201 (quoting *Free Enter. Fund*, 561 U.S. at 483), which introduced a "novel impediment" to presidential authority, *id.* at 2198; *see id.* at 2211 ("A decade ago, we declined to extend Congress's authority to limit the President's removal power to a new situation, never before confronted by the

Court.  We do the same today."); *cf. Free Enter. Fund*, 561 U.S. at 483 (declining "to reexamine any . . . precedents").

In short, *Seila Law* was crystal clear that it targeted only the new phenomenon of removal protections for agency heads who serve individually: "While we have previously upheld limits on the President's removal authority in certain contexts, we decline to do so when it comes to principal officers who, *acting alone*, wield significant executive power."  140 S. Ct. at 2211 (emphasis added).

If any doubt remained, *Collins v. Yellen* eliminated it.  In that challenge to the single-director Federal Housing Finance Agency, the Court concluded that "[a] straightforward application of our reasoning in *Seila Law* dictates the result."  141 S. Ct. at 1784.  And in *Seila Law*, the Court explained, "[w]e did not revisit our prior decisions allowing certain limitations on the President's removal power, but we found compelling reasons not to extend those precedents to the novel context of an independent agency led by a single Director."  *Id.* at 1783 (quotation marks omitted).

*Collins* specifically rejected an argument that the validity of removal limits turns on "the nature and breadth of an agency's authority."  *Id.* at 1784.  Instead, the Court's "straightforward" application of *Seila Law* was simple: "The FHFA

8

(like the CFPB) is an agency led by a single Director, and the Recovery Act (like the Dodd-Frank Act) restricts the President's removal power." *Id.*

### B. *Seila Law* Rested on Three Features Unique to Single-Director Independent Agencies.

After concluding that precedent did not resolve the legitimacy of removal protection for agency leaders who serve alone, *Seila Law* discussed three aspects of single-director leadership that it concluded made removal limits untenable in that context. None exists here.

#### 1. *Historical Anomaly*

First and foremost, *Seila Law* stressed that "[t]he CFPB's single-Director structure is an innovation with no foothold in history or tradition." 140 S. Ct. at 2202. Indeed, that structure was "almost wholly unprecedented." *Id.* at 2201. In "only a handful of isolated incidents" had Congress elsewhere "provided good-cause tenure to principal officers who wield power alone rather than as members of a board or commission." *Id.* at 2201 (quotation marks omitted). And nearly all of those "isolated examples" were also "comparatively recent and controversial." *Id.* at 2202. All told, the "lack of historical precedent" for the Bureau's single-director structure indicated a "severe constitutional problem." *Id.* at 2201 (quoting *Free Enter. Fund*, 561 U.S. at 505).

*Seila Law* was not the first time the Court articulated a suspicion of novelty. "Lack of historical precedent can indicate a constitutional infirmity," the Court has

written, because novelty "is often the consequence of past constitutional doubts." *Virginia Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 260 (2011).  Skepticism toward "novel governmental structures," *Seila Law*, 140 S. Ct. at 2207, reflects a principle the modern Court has applied across multiple contexts: "Legislative novelty is not necessarily fatal . . . . But sometimes the most telling indication of [a] severe constitutional problem . . . is the lack of historical precedent for Congress's action."  *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 549 (2012) (quotation marks omitted); *see Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 230 (1995) (Congress's "prolonged reticence" to assert an authority creates an "inference" that it is "constitutionally proscribed").

Applying this "antinovelty doctrine," the Court often presumes that "a law without historical precedent is constitutionally suspect."  Neal Kumar Katyal & Thomas P. Schmidt, *Active Avoidance: The Modern Supreme Court and Legal Change*, 128 Harv. L. Rev. 2109, 2139 (2015); *see* Leah M. Litman, *Debunking Antinovelty*, 66 Duke L.J. 1407, 1411-12 (2017) ("Every Justice on the Supreme Court has joined an opinion promoting the idea that legislative novelty is evidence of a constitutional defect.").

Unlike the "historical anomaly," *Seila Law*, 140 S. Ct. at 2202, of the CFPB's single-director leadership, there is nothing remotely novel about the Consumer Product Safety Commission.  It has the quintessential structure of a

multimember independent regulatory agency.  *Compare* Act to Regulate Commerce, § 11, 24 Stat. at 383 (establishing the ICC with a bipartisan structure of five Commissioners, serving six-year terms, removable for cause), *with* 15 U.S.C. § 2053(a), (b)(1), (c) (establishing the CPSC with a bipartisan structure of five Commissioners, serving seven-year terms, removable for cause).

Indeed, initial proposals for the CFPB were "modeled after the multimember Consumer Product Safety Commission."  *Seila Law*, 140 S. Ct. at 2192.  But Congress departed from that model "in one critical respect."  *Id.* at 2193.  "Rather than create a traditional independent agency headed by a multimember board or commission, Congress elected to place the CFPB under the leadership of a single Director."  *Id.*  That critical difference was why precedent could not justify the CFPB's "innovative intrusions on Article II."  *Id.* at 2205.

### 2.  *Greater Encroachment on Presidential Oversight*

*Seila Law* also concluded that removal protections in a single-director agency intrude on presidential authority more than in a traditional, multimember agency.  The CFPB's structure was therefore a "novel impediment to the President's oversight of the Executive Branch."  140 S. Ct. at 2192, 2198.

The CFPB's defenders had argued that a single-director independent agency is equally accountable to the president as a multimember agency.  *See, e.g.*, Br. for Court-Appointed *Amicus Curiae* 44-46 (Jan. 15, 2020) (No. 19-7).  But the Court

firmly rejected that argument, holding that the "unique structure" of the single-director Bureau "forecloses certain indirect methods of Presidential control" that are available to influence multimember bodies. *Seila Law*, 140 S. Ct. at 2204.

"Because the CFPB is headed by a single Director with a five-year term," a president could spend much of her term unable to remove a director holding diametrically opposed views. *Id.* Regardless of her own agenda, therefore, a president might well "enter office only to find herself saddled with a holdover Director from a competing political party who is dead set *against* that agenda." *Id.* "To make matters worse," the Court elaborated, "the agency's single-Director structure means the President will not have the opportunity to appoint any other leaders—such as a chair or fellow members of a Commission or Board—who can serve as a check on the Director's authority and help bring the agency in line with the President's preferred policies." *Id.* Indeed, "some Presidents may not have any opportunity to shape its leadership and thereby influence its activities," because they will "*never*" be able to appoint a director. *Id.*

None of this applies to the CPSC. With five commissioners serving staggered terms, regular vacancies allow every president to shape the agency's leadership and agenda through new appointments. *See* 15 U.S.C. § 2053(a), (b). Moreover, the president selects the agency's chairman, *id.* § 2053(a), who holds unique sway over the CPSC's work as its "principal executive officer," exercising

"all of the executive and administrative functions of the Commission," including "the appointment and supervision of personnel" and control over "the use and expenditure of funds," *id.* § 2053(f); *see id.* § 2053(g).  At the same time, the commissioners' staggered terms and the requirement of bipartisan representation, *id.* § 2053(c), prevent "abrupt shifts in agency leadership," *Seila Law*, 140 S. Ct. at 2200.

In short, the CPSC's familiar structure involves no "innovative intrusions on Article II." *Seila Law*, 140 S. Ct. at 2205.

### 3. *Concentration of Power in a Single Person*

The third feature of the CFPB's structure on which *Seila Law* rested was its consolidation of power in "a unilateral actor insulated from Presidential control." 140 S. Ct. at 2192.  According to the Court, this configuration simply had "no place in our constitutional structure." *Id.* at 2201.  With "the sole exception of the Presidency, that structure scrupulously avoids concentrating power in the hands of any single individual." *Id.* at 2202.

As *Seila Law* explained, the Framers made the executive branch "unique in our constitutional structure" by vesting power in a single person. *Id.* at 2203.  They balanced that choice by making the president "the most democratic and politically accountable official in Government" and by placing other executive officers under his "supervision and control." *Id.*  This "constitutional strategy," in

13

a nutshell, was to "divide power everywhere except for the Presidency, and render the President directly accountable to the people." *Id.*

"The CFPB's single-Director structure," however, "contravene[d] this carefully calibrated system by vesting significant governmental power in the hands of a single individual." *Id.* "With no colleagues to persuade," this individual could "unilaterally" wield a range of enforcement, adjudicatory, and rulemaking authorities. *Id.* at 2203-04.

The Court found this arrangement a far cry from the "multimember body of experts, balanced along partisan lines" that it previously had approved. *Id.* at 2199. The FTC discussed in *Humphrey's Executor* was an entirely different animal: "Composed of five members—no more than three from the same political party— the [FTC] was designed to be 'non-partisan' and to 'act with entire impartiality.'" *Id.* at 2198-99 (quoting *Humphrey's Ex'r*, 295 U.S. at 624). Its duties "called for 'the trained judgment of a body of experts'" to be "'informed by experience,'" while its "staggered, seven-year terms enabled the agency to accumulate technical expertise and avoid a 'complete change' in leadership 'at any one time.'" *Id.* at 2199 (quoting *Humphrey's Ex'r*, 295 U.S. at 624).

In contrast, the CFPB director had no "peers" to share his wide portfolio of authority or to temper his decisions. *Id.* at 2191. The Court held that "*this arrangement* violates the Constitution's separation of powers," *id.* (emphasis

added), because it "clashes with constitutional structure by concentrating power in a unilateral actor insulated from Presidential control," *id.* at 2192. The same cannot be said of "a traditional independent agency, run by a multimember board with a diverse set of viewpoints and experiences." *Id.* at 2192 (quotation marks omitted).

## II. Established Practice Places the Validity of Multimember Independent Agencies Beyond Doubt.

As discussed above, *Seila Law* confined itself to "the novel context of an independent agency led by a single Director." 140 S. Ct. at 2192. Petitioners, however, read it much more broadly. Ignoring most of the opinion, Petitioners characterize *Seila Law* as establishing a revolutionary new proposition—that all agency leaders who "exercise executive power" must be removable at will, Pet. Br. 56, even if they serve in "a traditional independent agency headed by a multimember board or commission," *Seila Law*, 140 S. Ct. at 2193. In Petitioners' view, *Seila Law*'s description of *Humphrey's Executor* functionally overruled that decision.

That is precisely what the Justices said they were *not* doing, both in *Seila Law* and in *Free Enterprise Fund*. *See Seila Law*, 140 S. Ct. at 2206 ("we do not revisit *Humphrey's Executor* or any other precedent"); *Free Enter. Fund*, 561 U.S. at 483, 501 (declining "to reexamine any of these precedents" or "to take issue with for-cause limitations in general"). *Seila Law* rejected the validity of "an

15

independent agency that wields significant executive power *and is run by a single individual*." 140 S. Ct. at 2192 (emphasis added). Petitioners would have this Court simply lop off part of that statement. So too for similar passages throughout the opinion. *E.g.*, *id.* at 2211 ("principal officers who, *acting alone*, wield significant executive power" (emphasis added)); *id.* at 2201 ("an independent agency *led by a single Director* and vested with significant executive power" (emphasis added)).

Even if one ignored all these passages, the notion that *Seila Law* outlaws a type of removal limit that has existed since the nineteenth century would be deeply implausible. Established practice has long settled the constitutional legitimacy of multimember independent agencies.

The flip side of the Supreme Court's suspicion of "novel governmental structures," *Seila Law*, 140 S. Ct. at 2207, is that "'traditional ways of conducting government . . . give meaning' to the Constitution," *Mistretta v. United States*, 488 U.S. 361, 401 (1989) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610 (1952) (Frankfurter, J., concurring)). For that reason, the Court "put[s] significant weight upon historical practice" in separation-of-powers cases. *Zivotofsky*, 576 U.S. at 23 (quotation marks omitted); *see The Pocket Veto Case*, 279 U.S. 655, 689 (1929) ("established practice is a consideration of great weight in a proper interpretation of constitutional provisions of this character"). When

construing the Constitution's broadly phrased divisions among the branches, judges "must hesitate to upset the compromises and working arrangements that the elected branches of Government themselves have reached." *Noel Canning*, 573 U.S. at 526.

Established practice is crucial "even when the nature or longevity of that practice is subject to dispute, and even when that practice began after the founding era." *Id.* at 525; *see id.* at 528-29 (relying on history of intra-session recess appointments that began after the Civil War); *United States v. Midwest Oil Co.*, 236 U.S. 459, 473 (1915) ("in determining . . . the existence of a power, weight shall be given to the usage itself, even when the validity of the practice is the subject of investigation"). As James Madison wrote, it "was foreseen at the birth of the Constitution, that difficulties and differences of opinion might occasionally arise in expounding terms & phrases necessarily used in such a charter . . . and that it might require a regular course of practice to liquidate & settle the meaning of some of them." *Noel Canning*, 573 U.S. at 525 (quoting Letter from James Madison to Spencer Roane (Sept. 2, 1819)).

Supreme Court decisions "have continually confirmed Madison's view." *Id.*; *e.g.*, *McPherson v. Blacker*, 146 U.S. 1, 27 (1892) ("where there is ambiguity or doubt, or where two views may well be entertained" in constitutional interpretation, "subsequent practical construction is entitled to the greatest

weight"); *McCulloch v. Maryland*, 17 U.S. 316, 401 (1819) ("a doubtful question" concerning the separation of powers, "if not put at rest by the practice of the government, ought to receive a considerable impression from that practice"); *Stuart v. Laird*, 5 U.S. 299, 309 (1803) ("practice and acquiescence" can "fix[] the construction" of constitutional provisions, "afford[ing] an irresistible answer" to contrary interpretations).

Congress has been assigning regulatory authority to multimember independent agencies for a majority of the nation's history, beginning nearly 150 years ago with the Interstate Commerce Commission. *See* Act to Regulate Commerce, § 11, 24 Stat. at 383 (establishing commission with leaders removable only for cause). The ICC had investigative and enforcement authority over the single most important component of the American economy, the railroads, including the power to issue cease-and-desist orders, to require payment of reparations, and to enforce its orders in court. *See id.* §§ 12-16, 20; *cf.* Pet. Br. 54-55 (citing the CPSC's authority "to regulate certain practices across a segment of the U.S. economy," "to seek daunting monetary penalties," and to "bring actions for injunctive enforcement" (quotation marks omitted)).

To the Congress that created the ICC, "independence . . . appears to have meant bipartisanship, as a guarantee of impartiality," or, in other words, "independence of one-sided partisan control." Robert E. Cushman, *The*

18

*Independent Regulatory Commissions* 61 (1941); *see* Marshall J. Breger & Gary J. Edles, *Established by Practice: The Theory and Operation of Independent Federal Agencies*, 52 Admin. L. Rev. 1111, 1127 (2000) ("bipartisan control of the commission was the main concern").  Although the Interior Secretary initially had some authority over the ICC, *see* Act to Regulate Commerce, §§ 18, 21, 24 Stat. at 386-87, Congress eliminated it two years later, *see* Act of Mar. 2, 1889, ch. 382, §§ 7-8, 25 Stat. 855, 861-62.  And in 1906, Congress empowered the ICC to prescribe maximum railroad rates, as well as "fair" and "reasonable" practices, *see* Act of June 29, 1906, ch. 3591, § 4, 34 Stat. 584, 589, cementing its status as "a very powerful agency," Breger & Edles, *supra*, at 1130.

In the early twentieth century, "a multitude of new agencies were established using the ICC as their prototype," including "the Federal Reserve Board (1913), Federal Trade Commission (1914), Federal Radio Commission (1927), Federal Power Commission (1930), Securities and Exchange Commission (1934), Federal Communications Commission (1934), National Labor Relations Board (1935), Bituminous Coal Commission (1935), and Federal Maritime Commission (1936)." *Id.* at 1116 & n.14.  Similar agencies, including the CPSC, proliferated throughout the rest of the century.

The long pedigree of these agencies is all but dispositive of their legitimacy. "A legislative practice . . . marked by the movement of a steady stream for a

century and a half of time" indicates "the presence of unassailable ground for the constitutionality of the practice." *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 327-28 (1936).

For generations, these multimember independent agencies have wielded substantial executive power. Even when their actions take legislative or judicial forms, such as rulemaking and adjudication, they are still "exercises of . . . the 'executive Power'" under the Constitution. *Arlington*, 569 U.S. at 304 n.4. Although the Supreme Court initially conceived of the FTC's authority as "quasi-legislative or quasi-judicial," rather than as executive, this view "has not withstood the test of time." *Seila Law*, 140 S. Ct. at 2198 & n.2. In other words, *Humphrey's Executor* permitted for-cause removal protections for a multimember agency with power that "would at the present time be considered 'executive.'" *Morrison v. Olson*, 487 U.S. 654, 699 n.28 (1988).

Regardless of whether *Humphrey's Executor* reflects an outdated notion of executive power, it remains a fact that the Court upheld the constitutionality of a multimember independent agency with the power "to prevent persons, partnerships, or corporations . . . from using unfair methods of competition," An Act to Create a Federal Trade Commission, ch. 311, § 5, 38 Stat. 717, 719 (1914), to charge private parties with violating that proscription, *id.*, to adjudicate those charges in administrative hearings, *id.*, to order private parties "to cease and desist

from using such method of competition," *id.* at 720, to enforce those orders in court, *id.*, and to issue "rules and regulations" carrying out its various authorities, *id.* § 6(g), 38 Stat. at 722; *cf.* Pet. Br. 54-55 (highlighting similar powers of the CPSC).

The Court never retreated from that holding, but instead repeatedly affirmed it. In *Wiener v. United States*, the Court confronted "a variant of the constitutional issue decided in Humphrey's Executor" and reached the same result. 357 U.S. 349, 351 (1958). By the time of *Morrison v. Olson*, it had been established for half a century that "the Constitution did not give the President 'illimitable power of removal' over the officers of independent agencies." 487 U.S. at 687 (quoting *Humphrey's Ex'r*, 295 U.S. at 630).

Two decades later, the Court again confirmed the validity of removal protections for multimember bodies wielding significant executive power. It held that Article II was satisfied where officers within the SEC were shielded from removal by "a single level of good-cause tenure." *Free Enter. Fund*, 561 U.S. at 509. Such officers were adequately "subject . . . to Presidential oversight." *Id.*

*Seila Law* reinforced these principles yet again. Not only did the Court emphatically base its holding on the "new situation" of an independent officer wielding power "alone," but it explained that Congress could cure the

21

constitutional defect while preserving removal limits by "converting the CFPB into a multimember agency." 140 S. Ct. at 2211.

Thus, for nearly a century, an unbroken line of decisions has approved a governmental structure that was pioneered another half-century before that. Over the generations, Congress has relied on this precedent to create "some two-dozen multimember independent agencies" with for-cause removal protections. *Id.* at 2206. This "practical exposition" of the Constitution is, by now, "too strong and obstinate to be shaken." *Laird*, 5 U.S. at 309.

The CPSC cannot be distinguished from the other multimember independent agencies that have long populated the executive branch. Such agencies with enforcement or rulemaking power include the Federal Reserve Board of Governors, Federal Deposit Insurance Corporation, Federal Election Commission, Federal Energy Regulatory Commission, Federal Labor Relations Authority, Federal Maritime Commission, Federal Trade Commission, National Credit Union Administration, National Labor Relations Board, Nuclear Regulatory Commission, Securities and Exchange Commission, U.S. International Trade Commission, and others. *See* Breger & Edles, *supra*, at 1236-94. Even more agencies possess adjudicatory authority. *See id.*

*All* of these agencies wield the Constitution's "executive Power." *Arlington*, 569 U.S. at 304 n.4. *Seila Law* did not silently invalidate the constitutionality of

all these multimember bodies in a case that did not even involve a multimember body.

III.   **Constitutional Text and History Further Underscore the Legitimacy of Multimember Independent Agencies.**

In addition to being validated by precedent and established practice, multimember independent agencies like the CPSC are fully consonant with the Constitution's original meaning.

When a limit on removal authority is challenged as unconstitutional, there are two sides to the coin:  On one side is the president's "executive Power" and duty to "take Care that the Laws be faithfully executed."  U.S. Const. art. II, § 1, cl. 1; *id.* art. II, § 3.  On the other is Congress's authority to define the federal government's "Departments" and "Officers," *id.* art. II, § 2, and to pass laws necessary and proper for "carrying into Execution . . . all . . . Powers vested . . . in the Government," *id.* art. I, § 8, cl. 18.  The precise line between these powers has long been contested, but the president has never been understood to enjoy an illimitable removal power.

Early on, it became "settled and well understood" that presidents have inherent removal authority, not shared with the Senate or dependent on legislation.  *Hennen*, 38 U.S. at 259.  But despite this acceptance of removal authority "as a general matter," *Free Enter. Fund*, 561 U.S. at 513, it was always understood that Congress has some leeway to limit this implied authority.

Congress started doing so in the nineteenth century. And until recently, the only removal limits ever judicially invalidated were quite different from the one at issue here. They effectively prevented removals *entirely*, either by requiring congressional consent, *see Myers v. United States*, 272 U.S. 52, 107 (1926); *Bowsher v. Synar*, 478 U.S. 714, 726 (1986), or by stacking multiple layers of tenure, *see Free Enter. Fund*, 561 U.S. at 486. While *Seila Law* clarified that "other innovative intrusions" can also violate Article II, 140 S. Ct. at 2205, this is plainly an area where doctrinal development is "liquidat[ing] & settl[ing] the meaning" of the Constitution, *Noel Canning*, 573 U.S. at 525 (quoting Letter from James Madison to Spencer Roane, *supra*). And that only reinforces the importance here of "[l]ong settled and established practice." *Id.* at 524 (quotation marks omitted).

**A.** The Constitution's text anticipates that Congress would "by Law" create "Departments" and "Officers," U.S. Const. art. II, § 2, but it specifies little about their relationship to the president. That was no accident: the Framers rejected a plan to delineate in the Constitution the duties of specific department heads who would serve "during pleasure." 2 *Records of the Federal Convention of 1787*, at 335-36 (Max Farrand ed., 1911).

Instead, the Framers gave Congress discretion over the manner in which "all" the federal government's powers would be "carr[ied] into Execution." U.S.

Const. art. I, § 8, cl. 18.  And "the constitution makes no mention of any power of removal by the executive of any officers whatsoever."  3 Joseph Story, *Commentaries on the Constitution of the United States* § 1531 (1833).

At the Founding, there was no consensus that "executive" power necessarily entailed removal authority.  *See* Martin S. Flaherty, *The Most Dangerous Branch*, 105 Yale L.J. 1725, 1790 (1996).  Removal authority was not "an inherent attribute of the 'executive power' as it was understood in England."  Daniel D. Birk, *Interrogating the Historical Basis for A Unitary Executive*, 73 Stan. L. Rev. 175, 182 (2021).  Nor in Founding-era state governments, where removal authority was typically "lodged in the Legislatures or in the courts."  *Myers*, 272 U.S. at 118.

**B.**  Because "[t]he Constitution is silent with respect to the power of removal from office," *Hennen*, 38 U.S. at 258, the issue came to the fore when Congress created the federal government's first departments.  But the ensuing "Decision of 1789" addressed only who, if anyone, possesses inherent removal power—not the extent to which Congress may condition that power.

The "real point which was considered and decided" was whether the Senate's role in approving appointments also gave it "part of the removing power." *Myers*, 272 U.S. at 119; *see Hennen*, 38 U.S. at 259.  As Congress considered legislation establishing a Foreign Affairs Secretary, disagreement arose about whether to declare that the president could remove the Secretary from office.  *See*

25

David P. Currie, *The Constitution in Congress: The First Congress and the Structure of Government, 1789–1791*, 2 U. Chi. L. Sch. Roundtable 161, 196-201 (1995).  Views differed about whether the Constitution gave inherent removal power to the president, the Senate, both, or neither.  *Id.*; *see Hennen*, 38 U.S. at 233.  The final legislation obliquely signaled that the president could remove the Secretary, but without specifying whether this power was statutory or constitutional.  *See* Act of July 27, 1789, ch. 4, § 2, 1 Stat. 28, 29.  Congress thus "left presidential removal to shadowy implication."  Saikrishna Prakash, *New Light on the Decision of 1789*, 91 Cornell L. Rev. 1021, 1052 (2006).

In short, the episode established only that "the constitution vested the power of removal in the President alone," not jointly with the Senate.  1 Annals of Cong. 398 (Rep. Vining) (1789).  Requiring the Senate's consent could prevent presidents from firing officers who failed to execute the law faithfully.  *See id.* at 395, 515-16 (Rep. Madison).

Whether Congress could limit removal in other ways was "never really contested," because the debate focused on where the removal power was lodged, not on Congress's authority to "modify or abridge" it.  Prakash, *supra*, at 1072.  Indeed, Madison remarked that while his belief in inherent presidential removal authority prevailed, it "is subject to various modifications, by the power of the Legislature."  Letter from James Madison to Edmund Pendleton, *Founders Online*

26

(June 21, 1789), https://founders.archives.gov/documents/Madison/01-12-02-0152;
*accord The Federalist No. 39*, at 242 (Clinton Rossiter ed., 1961) (Madison) ("The
tenure of the ministerial offices generally will be a subject of legal regulation.").

The Decision of 1789, therefore, "did not endorse the view that Congress
lacked authority to modify the Constitution's grant of removal power to the
President." Prakash, *supra*, at 1073.

**C.** In the following decades, Congress's power to modify the president's
removal authority remained widely accepted. As the Supreme Court put it, only
those offices "the tenure of which is not . . . limited by law" are held "subject to
removal at pleasure." *Hennen*, 38 U.S. at 259; *see id.* (removal power is "incident
to the power of appointment" only "[i]n the absence of . . . statutory regulation").
James Kent explained that the Decision of 1789 applied only to officers "whose
term of duration is not specifically declared," 1 *Commentaries on American Law*
289 (1826), and Joseph Story likewise wrote that the Decision did not address
"whether congress can give any duration of office . . . not subject to the exercise of
this power of removal," Story, *supra*, § 1531; *see id.* (executive officers "must hold
their offices during pleasure, unless congress shall have given some other duration
to their office").

Consistent with that understanding, when Congress set fixed terms for
various federal officers, Congress deemed it necessary to specify that they "shall

be removable from office at pleasure." Act of May 15, 1820, ch. 102, § 1, 3 Stat. 582, 582. That caveat would have been unnecessary if the Constitution already mandated removal at pleasure. It was needed because the president's general removal authority "was not regarded . . . as embracing officers with fixed term[s]." Edward S. Corwin, *Tenure of Office and the Removal Power under the Constitution*, 27 Colum. L. Rev. 353, 379 (1927).

In the second half of the nineteenth century, Congress imposed a variety of removal restrictions. When disputes arose, the Supreme Court consistently resolved them as statutory matters, *e.g.*, *McAllister v. United States*, 141 U.S. 174 (1891); *Shurtleff v. United States*, 189 U.S. 311 (1903), expressly avoiding "arriving at a decision [on] the question of the constitutional power of the president in his discretion to remove officials during the term for which they were appointed," *Parsons v. United States*, 167 U.S. 324, 334 (1897).

Not until *Myers* did the Court firmly establish the president's removal authority, rejecting a requirement of Senate approval because it could make it "impossible for the President, in case of political or other difference with the Senate or Congress, to take care that the laws be faithfully executed." 272 U.S. at 164. But in contrast, the Court upheld good-cause tenure for the leaders of multimember expert agencies less than ten years later. *Humphrey's Ex'r*, 295 U.S. at 626. It has done so ever since. *See Free Enter. Fund*, 561 U.S. at 509 (curing

constitutional defect by subjecting multimember body to "a single level of good-cause tenure"); *Seila Law*, 140 S. Ct. at 2211 (inviting Congress to preserve removal limits by "converting the CFPB into a multimember agency").

## CONCLUSION

For the foregoing reasons, this Court should hold that the CPSC's structure is constitutional.

Respectfully submitted,

*/s/ Brianne J. Gorod*
Elizabeth B. Wydra
Brianne J. Gorod
Brian R. Frazelle
CONSTITUTIONAL ACCOUNTABILITY CENTER
1200 18th Street NW, Suite 501
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amicus Curiae*

Dated: August 17, 2023

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because it contains 6,440 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 14-point Times New Roman font.

Dated: August 17, 2023.

*/s/ Brianne J. Gorod*
Brianne J. Gorod

## CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of August, 2023, I electronically filed

the foregoing document using the Court's CM/ECF system, causing a notice of

filing to be served upon all counsel of record.

Dated: August 17, 2023

*/s/ Brianne J. Gorod*
Brianne J. Gorod